UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

DAYTON SUPERIOR CORPORATION,

   Plaintiff,

-v-

JULIAN Z. YAN, et al.,

   Defendants.

Case No. 3:12-cv-380

Judge Thomas M. Rose

### ENTRY AND ORDER GRANTING DAYTON SUPERIOR'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER

Now before the Court is an application for a Temporary Restraining Order ("TRO") by Plaintiff Dayton Superior Corporation ("Superior"). (Doc. #2.) Superior seeks to restrain Defendants Julian Z. Yan ("Yan"), Michael R. Klover ("Klover") and Epoxy Products Company, LLC ("EPCO") from using Superior's trade secrets and Yan from competing with Superior.

The Court has held two hearings on the TRO. One on November 8, 2012, and one on November 9, 2012. Neither Yan nor Klover were represented at these hearings. The other Parties were represented.

To obtain injunctive relief, a movant must first show that there is no adequate remedy at law for the alleged injury. *Dana Corp. v. Celotex Asbestos Settlement Trust*, 251 F.3d 1107, 1118 (6th Cir. 2001). If this is shown, the court must then weigh four factors: (1) whether the movant is likely to prevail on the merits; (2) whether the movant would suffer irreparable injury if the court does not grant the TRO; (3) whether a TRO would cause substantial harm to others; and (4) whether a TRO would be in the public interest. *Samuel v. Herrick Memorial Hospital*, 201 F.3d 830, 833 (6th Cir. 2000)(citing *Glover v. Johnson,* 855 F.2d 277, 282 (6th Cir. 1988)).

## RELEVANT FACTUAL BACKGROUND

### Superior and Unitex

Superior is a manufacturer and distributor of commercial construction chemical systems and related products, including a line of epoxy-based products. (Declaration of David DeBruler ("DeBruler Dec.") ¶¶ 2,3 Nov. 6, 2012.) Superior is a successor to Zea Corporation, Inc. which did business as "Unitex." (Declaration of Andy Gaines ("Gaines Dec.") ¶ 3 Nov. 6, 2012.) Unitex products were, and still are, developed and sold from a facility in Kansas City, Missouri. (Id. ¶ 4.)

In September of 2010, Superior acquired the assets of Unitex, including the Unitex trade name. (Id.) Unitex specialized in manufacturing and selling epoxy-based products, specifically epoxy construction chemicals and related products, such as epoxy grouts, epoxy chocks, epoxy sealers and epoxy overlays. (Id. ¶ 3.)

Epoxy products consist primarily of an epoxy resin and a hardening agent. (DeBruler Dec. ¶ 2.) Some epoxy-based products also incorporate an aggregate component. (Id.) Epoxy products vary by the differing proportions of the main components, the chemical process for combining the components and the additional materials and chemicals that may be added at various phases of production. (Id.)

### Confidential Product Development Information

Superior develops and produces its products using processes, materials, knowhow, tools and recipes kept in strict confidence (the "Confidential Product Development Information"). (Id. at ¶ 3.) The Confidential Product Development Information is known in varying degrees by Superior employees and consultants but is not generally known outside of Superior. (Id. at ¶ 4.)

Also, Superior does not share or sell its Confidential Product Development Information. (Id.)

Superior stores its chemical formulas and processes on a password-protected, off-network computer. (Id.) Any employee who works with the Confidential Product Development Information must execute a confidentiality agreement. (Id. at ¶ 9.) Also, computerized access to the Confidential Product Development Information is heavily restricted. (Id. at ¶ 10.) Finally, the computers are maintained "off network." (Id.)

Access to Superior's laboratories is restricted to employees who are subject to a confidentiality agreement. (Id. at ¶ 11.) Materials may not be removed without prior authorization. (Id.)

Confidentiality is further maintained by the difficulty inherent in reverse engineering the Unitex products. (Id. at ¶ 12.) Reverse engineering would, at best, reveal the basic chemical components but would not reveal the chemical processes for combining the basic components and other chemicals. (Id.) Reverse engineering would also not necessarily reveal the existence of small amounts of other necessary chemicals. (Id.)

Superior alleges that it enjoys competitive advantages by using the Confidential Product Development Information. (Id. at ¶ 5.) Specifically, Superior produces superior quality construction products that are tailored to meet changing customer needs for products that can be used in a variety of construction environments. (Id.) By adding Unitex's product lines, Superior was able to add competitive epoxy-based construction products to the Confidential Product Development Information. (Id. at ¶ 7.)

In 2010, Superior invested $2.23 million in Unitex technology and proprietary formulae. (Id. at ¶ 8.) This amount does not include costs that Superior has incurred since 2010 or other

hidden costs. (Id.) A Superior competitor wanting to duplicate the Confidential Product Development Information "from scratch" would incur similar expenses. (Id.)

**<u>Confidential Customer Development Information</u>**

Superior also develops and maintains confidential information related to its current and prospective customers, including strategies and plans, customer information, pricing information, and other proprietary business information (the "Confidential Customer Development Information"). (Gaines Dec. ¶ 5.) Superior enjoys competitive advantages by using the Confidential Customer Development Information. (Id. at ¶ 6.)

Using the Confidential Customer Development Information, Superior identifies markets or customers where Superior should direct its sale efforts. (Id.) Keeping this information confidential prevents competitors from using Superior's efforts to identify such customers or markets. (Id. at ¶ 7.) Keeping this information confidential also prevents competitors from exploiting Superior's efforts because pricing is subject to change for a variety of reasons. (Id. at ¶ 8.) Most importantly, maintaining customer contact information and technical requirements is critical to Superior's efforts to stay up-to-date with emerging customer needs. (Id. at ¶ 9.)

Due to the critical competitive advantages and high costs associated with developing and updating the Confidential Customer Development Information, Superior makes strong efforts to keep such information secret. (Id. at ¶ 11.) Any employee working with the Confidential Customer Development Information must execute a confidentiality agreement. (Id.) Also, all computerized access to Confidential Customer Development Information is heavily restricted, requiring a password and other authenticating criteria which is entered by an employee who is subject to the confidentiality agreement. (Id. at ¶ 12.)

In 2010, Superior invested $8.14 million to purchase Unitex customer relationships and the Unitex trade name. (Id. at ¶ 5.) Anyone duplicating Superior's Unitex-related Confidential Customer Development Information "from scratch" would incur similar expenses. (Id.)

**Yan's Employment With Superior**

Unitex employed Yan as Technical Director, responsible for research and product development, quality control and raw material selection and purchasing. (DeBruler Dec. ¶ 13.) Yan was educated and trained, and had prior work experience, in the field of chemistry. (Id.) Yan had access to all Unitex product formulations, materials and suppliers. (Id. at ¶ 14.)

Yan's employment with Unitex was governed by the Employment Agreement and Unitex's standard Noncompetition and Nondisclosure Agreement ("NDA"). (Id. at ¶¶ 15, 16.) In the NDA, Yan acknowledged disclosure to him of Confidential Information[1]. (Id. at ¶ 17.) Yan also agreed to not "use, publish, disclose, appropriate or communicate" the Confidential Information. (Id. at ¶ 18.) Finally, Yan acknowledged that he "could threaten the value of the Employer's business if the Employee were to compete with Employer's business. (Id. at ¶ 19.) Consequently, Yan promised not to compete with Superior for a period of one year following separation. (Id.) Superior succeeded to all rights under the NDA. (Id.)

In 2010, in connection with Superior's acquisition of Unitex, Superior hired Yan as a Senior Technical Manager. (Id. at ¶ 20.) Yan's duties at Superior included research and development, quality control and raw material selection and purchasing. (Id.) At Superior, Yan specifically worked with chemical products, including form releases, cures, sealers and epoxies.

---

[1] The Confidential Information includes the Confidential Product Development Information and the Confidential Customer Development Information.

(Id.)

After being hired by Superior, Yan executed a Confidential Information & Inventions Agreement (the "Yan Confidential Information Agreement"). Id. at ¶ 21.) Therein, Yan acknowledged that he would have access to Superior's trade secrets and other confidential information, including Unitex product formulations, raw materials and raw materials suppliers. (Id.) Also therein, Yan agreed to never disclose Confidential Information. (Id.)

After being hired by Superior, Yan also executed (1) a Conflict of Interest Agreement providing that he would protect corporate information and avoid undue outside influence on his work-related activities and (2) a Policy Acknowledgment Agreement providing that information and information technology assets are and shall remain the property of the Corporation. (Id. at ¶ 22.)

On July 12, 2012, Yan entered into a Consulting Services Agreement. (Id. at ¶ 22.) Generally, this Agreement created new obligations and preserved previously-created obligations pertaining to Yan and his business relationship with Superior. (Id.) In effect, the provisions of the aforementioned agreements, particularly relating to Yan's duty to keep Superior's Confidential Information secret, remained in full force and effect. (Id.)

On September 27, 2012, Superior terminated Yan's Consulting Agreement. (DeBruler Dec. ¶ 26.) After his termination, Yan returned his company-owned laptop computer to Superior in an inoperable condition. (Id. at ¶ 27.) Superior believes that Yan intentionally caused damage to the laptop computer to hide evidence that he had removed or inappropriately accessed Confidential Information from the laptop.(Id.)

**Klover's Employment With Superior**

Klover was employed by Unitex in a sales/account management position. (Id. ¶ 24.) Klover worked with Yan at Unitex in the same location for about six years. (Id.)

Superior hired Klover in connection with its acquistion of Unitex. (Gaines Dec. ¶ 16.) Klover's duties at Superior included account management and sales growth. (Id.) While at Superior, Klover had access to Confidential Customer Development Information including trade secrets such as customer and supplier lists, sales information, pricing information, marketing arrangements, strategies, business plans, internal performance statistics and customer specifications. (Id. at ¶ 17.)

When Superior hired Klover, Klover executed a Confidential Information & Inventions Agreement (the "Klover Confidential Information Agreement"). (Id.) Klover also signed a Conflict of Interest Agreement and a Policy Acknowledgment. (Id. at ¶ 18.)

On February 10, 2012, Klover terminated his position with Superior ostensibly due to dissatisfaction with compensation. (Id. at ¶ 19.) He took with him six years of experience with Superior/Unitex is sales and account management. (Id.)

On December 15, 2011, prior to terminating his position with Superior and unbeknownst to Superior, Klover, among others, formed EPCO. (Id. at ¶ 22.) Klover used his position at Superior to establish a new "private label" customer account with Superior under the EPCO name. (Id. at ¶ 20.) Private label meant that the customer would provide its own label for the products. (Id.)

Klover caused the account to be set up so that EPCO would receive excessively low pricing. (Id. at ¶ 21.) While still employed by Superior, Klover caused EPCO to order products

from Superior manufactured according to Superior's proprietary specifications. (Id.)

In January of 2012, EPCO began operating its business involving the mixing of chemicals to make concrete construction products. (Affidavit of Laszlo Goodell ("Goodell Aff.") ¶¶ 6,7 Oct. 29, 2012.) EPCO manufactured epoxy grout and epoxy chock. (Id. at ¶ 9.) EPCO operates its business at 14000 Norby Road, Grandview, Missouri. (Id. at ¶¶ 2,5.) Finally, EPCO appears to be selling products that are the same or similar to Superior's Unitex products and selling them to Superior's current and prospective customers. (Gaines Dec. ¶ 23.)

### Yan's Employment With EPCO

Because Klover does not have the advanced scientific expertise required to operate a functional chemicals mixing operation, he would need technical assistance from someone like Yan. (DeBruler Dec. ¶ 25.) In fact, Yan is employed at EPCO. (Goodell Aff. ¶ 9.) Further, all of the chemical formulas used in EPCO's products were provided by Yan. (Id. ¶ 12.)

Frequently when EPCO had a technical problem with chemical mixing, Klover would say that he was going to call "Julian." (Id.) Laszlo Goodell ("Goodell"), a former EPCO employee, first saw Yan at EPCO sometime in January, February or March of 2012. (Id. ¶ 13.) Between January and September of 2012, Goodell saw Yan with Klover in the Norby Road facility at least 5 to 10 times. (Id. at ¶ 14.)

When Yan was at the Norby Road facility, he oversaw and directed how to handle and mix the chemicals used to make EPCO's products. (Id.) EPCO's processes improved as the result of Yan's involvement. (Id.) Finally, Yan was involved in dealing with EPCO's prospective customers. (Id.)

## NO ADEQUATE REMEDY AT LAW

Before granting injunctive relief, the Court must determine if Superior has an adequate remedy at law for its trade secrets claim and its covenant-not-to-compete claims. The trade secrets claim will first be considered.

Because trade secrets rights include the right to exclude, the damages arising from the misappropriation of trade secrets is irreparable and impossible to calculate. *Deutsch Inv. Mgmt., Inc. v. Riverpoint Capital Mgmt.*, No. 1:02-CV-577, 2002 U.S. Dist. LEXIS 16147 at *18 (S.D. Ohio Aug. 22, 2002.) "Therefore, where it is shown that the defendant has misappropriated the plaintiff's trade secrets, a preliminary injunction ordinarily should issue." *Id.*

In this case, Superior has presented evidence that Yan, Klover and EPCO have misappropriated Superior's trade secrets. Thus, there is no adequate remedy at law for Superior's trade secrets claim.

Where an employee works for a competitor is a substantially similar capacity to the position he held while working for the employer, there is no adequate remedy at law and injunctive relief is appropriate. *Prosonic Corp. v. Stafford*, 539 F. Supp.2d 999, 1007 (S.D. Ohio 2008). In this case, Superior has presented evidence that Yan and Klover are working for EPCO, a competitor, in substantially similar capacities to the positions they held while working at Superior. Thus, there is no adequate remedy at law for Superior's covenant-not-to-compete claims. Finding no adequate remedy at law for Superior's claims, the Court next weighs the four factors to determine if injunctive relief should issue.

# INJUNCTIVE RELIEF FACTORS

## Likelihood of Success On the Merits - Trade Secrets Claims

The Court first considers Superior's likelihood of success on the merits of its trade secrets claims. Under Ohio's Uniform Trade Secrets Act, actual or threatened misappropriation of a plaintiff's trade secrets may be enjoined. Ohio Rev. Code § 1333.62(A). To prevail on a misappropriation of trade secrets claim, a plaintiff must show (1) that a trade secret exists; (2) that the defendant acquired the trade secret as a result of a confidential relationship; and (3) that the defendant engaged in unauthorized use of the trade secret. *Heartland Home Fin., Inc. v. Allied Home Mtg. Cap. Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008).

### The Existence of a Trade Secret

A trade secret is information that derives independent economic value, actual or potential, from not being generally known to other persons and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Ohio Rev. Code § 1333.61(D). For example, chemical formulations and pricing policies generally not known outside of a company have been found to be the company's trade secrets. *Penetone Corp. v. Palchem, Inc.*, 627 F. Supp. 997, 1006 (N.D. Ohio 1985). Also, listings of names, addresses, or telephone numbers that have not been published or disseminated or have not otherwise become a matter of general public knowledge have been found to be trade secrets. *Fred Sigel Co., L.P.A. v. Arter and Hadden*, 707 N.E.2d 853, 862 (Ohio 1999).

Efforts to restrict physical access to trade secrets and requiring employees to execute confidentiality agreements have been found to be reasonable steps to protect trade secrets. *Valco Cincinnati, Inc. v. N & D Machining Service, Inc.*, 492 N.E.2d 814, 819 (Ohio 1986). The

protection of computerized records through password-based access restrictions has also been deemed reasonable protection. *The Rightthing, LLC v. Brown*, No. 3:09 CV 135, 2009 WL 249694 at *8 (N.D. Ohio Feb. 2, 2009).

In this case, there is evidence that the Confidential Information constitutes trade secrets under Ohio law. There is evidence that the Confidential Product Development Information is not generally known in the industry and not easily replicated or reverse engineered. Also, the Confidential Product Development Information is reasonably protected by several layers of security, such as password protections, non-disclosure agreements, restrictions on off-site access and restrictions on physical access to where the Confidential Product Development Information is housed. Finally, Superior invested over $2.23 million to acquire and develop the Confidential Product Development Information. Therefore, there is evidence that the Confidential Product Development Information includes protectable trade secrets.

Like the Confidential Product Development Information, there is evidence that the Confidential Customer Development Information is not generally known to Superior's competitors. Superior reasonably protects the Confidential Product Development Information with password-protected computer access, with confidentiality agreements and by limiting access. Superior has invested at least $8.14 million to acquire and develop the Confidential Customer Development Information relating to Unitex products. Therefore, there is evidence that the Confidential Customer Development Information includes protectable trade secrets..

**Trade Secret Acquired as a Result of Confidential Relationship**

A confidential relationship may be inferred from the circumstances surrounding the relationship between the owner of the trade secret and the defendant. *Vanguard Transp. Sys.,*

*Inc. v. Edwards Transfer & Storage Co. Gen. Commodities Div.*, 673 N.E.2d 182, 185 (Ohio Ct. App. 1996). Also, where an express agreement bars disclosure of trade secrets, the defendant acquires trade secrets through a confidential relationship. *MEMC Elec. Materials v. Balakrishnan*, No. 2:12-CV-344 , 2012 WL 3962905 at *7 (S.D. Ohio Sept. 11, 2012).

In this case, there is evidence that both Yan and Klover agreed in writing to protect Superior's trade secrets. Thus, there is evidence that Yan, Klover and EPCO acquired the trade secrets by exploiting Yan's and Klover's confidential relationships with Superior.

**Unauthorized Use of the Trade Secret**

The unauthorized use, or misappropriation, of trade secrets means (1) the acquisition of a trade secret by one with knowledge that acquisition was improper or (2) the disclosure or use of a trade secret. Ohio Rev. Code § 1333.61(B). Also, under the "inevitable disclosure rule," a former employee working for a competitor will be enjoined because an individual cannot compartmentalize a competitor's knowledge and disclosure or misappropriation of trade secrets is inevitable. *Balakrishnan*, 2012 WL 3962905 at *9 (citing *Dexxon Digital Storage, Inc. v. Haenszel*, 832 N.E.2d 62, 68-69 (Ohio Ct. App. 2005)).

In this case, both the statutory definition and the "inevitable disclosure rule" apply. With regard to the statutory definition of misappropriation, there is evidence that Yan, Klover and EPCO have each misappropriated Superior's Confidential Information. There is also evidence that Yan and Klover have used the Confidential Information and disclosed it to EPCO with knowledge that the acquisition was improper. Thus, there is evidence that EPCO has acquired the Confidential Information, knowing that Yan's and Klover's disclosure of it was improper.

With regard to the "inevitable disclosure rule," there is evidence that Yan has proprietary

knowledge of Superior's products, manufacturing process and specialized chemical methods. Yan also has information regarding Superior's product's strengths and weaknesses and Superior's marketing strategy. Similarly, there is evidence that Klover has specialized knowledge of Superior's customer contacts, customer needs and pricing strategies. There is evidence that both Yan and Klover are now employed by EPCO, one of Superior's direct competitors. Thus, it is inevitable that Yan and Klover will disclose Superior's trade secrets to EPCO. Therefore, Yan and Klover have misappropriated Superior's trade secrets violating their confidentiality obligations to Superior. In sum, based upon the evidence presented, Superior has shown a likelihood of success on its trade secrets claims.

## Likelihood of Success On the Merits On Noncompete Claim

The Court next considers Superior's likelihood of success on the merits of its noncompete claim. In Missouri, a covenant not-to-compete is valid if the agreement's restrictions are reasonable. *Sigma Chem. Co. v. Harris*, 605 F. Supp. 1253, 1260 (E.D. Mo. 1985). A covenant not-to-compete is reasonable if the geographic and temporal restrictions "serve the employer's legitimate protectable interest[s]." *Id.* If an employer's customer base is geographically diverse, a broad geographic scope is appropriate. *Id.* Finally, Missouri courts routinely uphold non-compete agreements with terms of one year or longer. *See Kessler-Heasley Artificial Limb Co., Inc. v. Kenney*, 90 S.W.3d 181 (Mo. Ct. App. 2002)(5 years); *Washington Cty. Mem. Hosp. v. Sidebottom*, 7 S.W.3d 542 (Mo. Ct. App. 1999)(1 year); *Schott v. Beussind*, 950 S.W.2d 621 (Mo. Ct. App. 1997)(2 years).

The NDA signed by Yan is governed by Missouri law. Superior's strong and protectable interest in the maintenance of customer relationships and the secrecy of its Confidential

Information justifies enforcement of the NDA. By executing the NDA, Yan agreed to not work for or disclose Confidential Information to a Superior competitor for a period of one year after his separation. Thus, enforcement of the NDA is reasonable.

There is evidence that Yan now works for EPCO, which is a Superior competitor that operates 20 miles from Yan's previous work station at the Unitex facility. Thus, there is evidence that Superior has a strong likelihood of success on the merits of its noncompete claim.

### **Irreparable Injury**

Irreparable injury generally results from a competitor's misappropriation of trade secrets due to "the potential for lasting and unjust competitive harm that would not otherwise occur." *Novak v. Farneman*, No. 2:10-CV-768, 2010 WL 4643002 at *6 (S.D. Ohio Nov. 9, 2010). In addition, an actual threat of irreparable injury may be established by showing that the employee possessed the employer's trade secrets. *Id.*

Irreparable injury also generally results from a competitor's misappropriation of confidential customer information. *See Salinger v. Colting*, 607 F.3d 68,81 (2d Cir. 2010)(a loss that is difficult to replace or difficult to measure is irreparable); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001)(evidence of threatened loss of prospective customers or goodwill is irreparable harm); *Muniauction, Inc. v. Thompson Corp.*, 502 F. Supp.2d 477, 482-83 (W.D. Pa. 2007)(loss of market share is irreparable injury), *rev'd on other grounds*, 532 F.3d 1318 (Fed. Cir. 2008).

In this case, there is evidence that Superior will suffer irreparable injury without an injunction. First, Superior has the right to exclude Klover, Yan and EPCO from the use of its trade secrets. Yet, the evidence shows that Yan is using proprietary chemical formulas and

methods that belong to Superior. The evidence also shows that Klover is using pricing information, customer contacts, sales strategies, customer specifications and other information belonging to Superior and used by Superior to compete in the market. In sum, there is evidence that the threat of disclosure or misappropriation of Superior's trade secrets constitutes irreparable injury.

Superior is also suffering irreparable injury from the misappropriation of its confidential customer information. There is evidence that Yan and Klover are using Superior's trade secrets to gain unfair competitive advantages and damaging Superior's market share and customer growth. There is also evidence that EPCO is taking Superior's market share of epoxy-based construction products and is inevitably acquiring customers that otherwise would have purchased products from Superior.

Finally, there is evidence that Superior is suffering irreparable injury from Yan's violation of the NDA. Many courts have found that a mere violation of a covenant not-to-compete is an irreparable injury. *Pro Edge, L.P. v. Gue,* 374 F. Supp.2d 711, 749 (N.D. Iowa 2005). Further, a substantial threat of substantial harm exists when a defendant employee possess knowledge of a former employer's trade secrets and begins working in a position that causes the employee to compete directly with the former employer or the product line that the employee formerly supported. *Prosonic*, 539 F. Supp.2d at 1007 (citing *Jacono v. Invacare Corp.*, No. 86605, 2006 WL 832451 at *7 (Ohio Ct. App. Mar. 30, 2006)). Finally, where the employee works for a competitor in a substantially similar capacity to the prior position he held, the prior employer suffers irreparable harm. *Id.*

In this case, there is evidence that Yan possess Superior's Confidential Information and is

using it to assist EPCO in producing epoxy construction products in competition with Superior. There is also evidence that Superior has lost market share and prospective customers since EPCO began competing with Superior. Finally, there is evidence that Yan has specialized knowledge that he could use in his employment with EPCO to compete with Superior.

## Substantial Harm

The Court must next consider whether a preliminary injunction would cause substantial harm to others. The only harm from the issuance of an injunction would be to Yan, Klover and EPCO. Yet, these parties cannot be heard to complain about the effect that a TRO would have on their business, even though a TRO may shut down the business. *See Apple Computer v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983)(if a knowing infringer could be heard to complain, a knowing infringer would be permitted to construct its business around its infringement which is an unacceptable result).

## Public Interest

Finally, the Court must consider whether the issuance of a TRO would be in the public interest. Generally, upholding reasonable contracts is in the public interest. *Prosonic*, 539 F. Supp. 2d at 1008. In addition, maintaining commercial ethics and protecting trade secrets in which a plaintiff has substantially invested are in the public interest. *Kendall Holdings, Ltd. v. Eden Cryogenics LLC*, 630 F. Supp.2d 853, 869 (S.D. Ohio 2008). Finally, the public interest is served in the enforcement of valid restrictive covenants contained in lawful contracts. *ALTA Analytics, Inc. v. Muuss*, 75 F. Supp.2d 773, 786 (S.D. Ohio 1999).

Based upon the evidence presented thus far, the public interest favors enjoining Yan, Klover and EPCO. Superior has shown that it has substantially invested in the innovation

underlying the Unitex products and thus is protecting these trade secrets. The NDA is an enforceable contract that includes a valid restrictive covenant.

## CONCLUSION

Based upon the evidence presented, there is no adequate remedy at law. Further, the balance of equities favors enjoining Yan, Klover and EPCO. The evidence indicates that Superior has a likelihood of success on the merits on its trade secrets and noncompete claims. The evidence also indicates that Superior will suffer irreparable injury if Yan, Klover and EPCO are not enjoined. A TRO would not cause substantial harm to others aside from those purportedly acting illegally and the issuance of a TRO would be in the public interest.

## TEMPORARY RESTRAINING ORDER

**1. Julian Z. Yan must cease and desist using, disclosing and communicating the confidential information and trade secrets of Dayton Superior; and**

**2. Julian Z. Yan must cease and desist from engaging in any business activity in competition with Dayton Superior, including any business activity on behalf of, or in conjunction with EPCO; and**

**3. Michael R. Klover must cease and desist using, disclosing and communicating the confidential information and trade secrets of Dayton Superior; and**

**4. EPCO must cease and desist using, disclosing and communicating the confidential information and trade secrets of Dayton Superior.**

## Bond

Federal Rule of Civil Procedure 65(c) provides that a court may issue a TRO "only if the movant gives security in an amount that the court considers proper to pay the costs and damages

sustained by any party found to have been wrongfully enjoined or restrained." In this case, based on EPCO's annual profits and other possible damages, the Court sets the security amount at $250,000.

## **Effective Dates**

This TRO shall become effective at the time and date when Superior posts the above security amount with the Court. It shall remain in effect for fourteen days.

**DONE** and **ORDERED** in Dayton, Ohio this Thirteenth Day of November, 2012.

                                                **s/Thomas M. Rose**

                                            _____
                                              THOMAS M. ROSE
                                     UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Julian Z. Yan (at his last known address and at EPCO)
Michael R. Klover (at his last know address and at EPCO)
Epoxy Products Company, LLC
Attorney Doug Weems