## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

**DAYTON SUPERIOR CORPORATION,**

   **Plaintiff,**

-v-

**JULIAN Z. YAN, et al.,**

   **Defendants.**

**Case No. 3:12-cv-380**

**Judge Thomas M. Rose**

_____

### ENTRY AND ORDER OVERRULING SUPERIOR'S MOTION FOR A PRELIMINARY INJUNCTION (Doc. #3) AND OVERRULING SUPERIOR'S MOTION FOR A SHOW CAUSE ORDER (Doc. #54)

_____

Plaintiff Dayton Superior Corp. ("Superior") brought this action against Defendants Epoxy Products Company, LLC ("EPCO"), Julian Yan ("Yan") and Michael Klover ("Klover") for misappropriation of trade secrets and confidential and proprietary information in violation of Ohio law as well as other contractual obligations. Klover and EPCO have counterclaimed that Superior has violated the Missouri Merchandising Practices Act by failing to pay commissions owed to Klover.

On November 13, 2012, this Court, based upon affidavits presented by Superior, temporarily restrained Yan, Klover and EPCO from using, disclosing and communicating Superior's confidential information and trade secrets and temporarily restrained Yan from competing with Superior. (Doc. #9.) The temporary restraint went into effect on November 20, 2012, when Superior posted a bond. The temporary restraint remains in effect pending the Court's ruling on Superior's Motion for a Preliminary Injunction.

Now before the Court is Superior's Motion for a Preliminary Injunction. (Doc. #3.)

Therein, Superior seeks to restrain Defendants Yan, Klover and EPCO from using Superior's trade secrets and Yan from competing with Superior for a period of one year.

In its Post-Hearing briefs, Superior argues that it has a strong likelihood of success on the merits of its other contract claims against Yan and Klover. (Doc. #78.) However, Superior did not initially move for a preliminary injunction on its other contract claims against Yan and Klover. Therefore, whatever these other contract claims might be, they will not be further considered as part of Superior's Motion for a Preliminary Injunction that is now before the Court.

Klover and EPCO submitted a memorandum opposing Superior's Motion for a Preliminary Injunction. (Doc. #59.) A Hearing on Superior's Motion for a Preliminary Injunction was conducted on January 17 and 18, 2013. Following the Hearing, the Parties submitted simultaneous Memorandums and simultaneous Responses. This matter is, therefore, ripe for decision.

Prior to the Hearing, Superior filed a Motion for an Order directing Klover and EPCO to show cause as to why they should not be held in contempt of Court for their alleged refusal to comply with the temporary restraints placed on them by the Court. (Doc. #54.) Superior also requested that this Motion be heard at the same time as its Motion for a Preliminary Injunction. This Motion is also now fully briefed, including testimony presented at the Hearing, and is, therefore, ripe for decision.

## RELEVANT FACTS

The "facts" that Superior alleges that the Court has already determined are based upon Superior's ex-parte application for a temporary restraining order. The facts identified below are

based upon a hearing which included the cross examination of witnesses and an evaluation of witness credibility by the Court. It is the facts the Court identifies below that are used to determine whether a preliminary injunction should issue.

### Superior and Unitex

Superior is a manufacturer and distributor of commercial construction chemical systems and related products. (Compl. ¶ 6.) On September 13, 2010, Superior acquired the Unitex business from ZEA Corporation, Inc. ("ZEA") and John Grissinger. (Transcript of 1/17/13 and 1/18/13 Preliminary Injunction Hearing ("Tr.") 49-50; PX[1] 38.)

Unitex specializes in manufacturing and selling epoxy-based products, specifically epoxy construction chemicals and related products, such as epoxy grouts, epoxy chocks, epoxy sealers and epoxy overlays. (Tr. 137-38, 155, 374.) Unitex products were, and still are, developed and sold from a facility in Kansas City, Missouri. (Id.)

### Epoxy Products

Epoxy products consist primarily of an epoxy resin and a hardening agent known as Parts A and B. (Tr. 439-44.) Some epoxy products also include an aggregate known as Part C.[2] (Id.) Epoxy products vary by the differing proportions of the main components, the chemical process for combining the components and the additional materials and chemicals that may be added at various phases of production. (Id.) Unitex manufactures Parts A and B and purchases Part C. (Tr.

---

[1]Exhibits admitted by the Court pursuant to the Hearing are referred to as "PX" for exhibits introduced by Superior, "EK" for exhibits introduced by EPCO and Klover and "YAN" for exhibits introduced by Yan. In some cases, the same exhibit was introduced by multiple Parties.

[2]The composition of an aggregate can vary from supplier to supplier and even within a supplier. (Tr. 474-75.)

139.)

## Superior's Product Information

### The Formulas

Superior asserts that its "Confidential Product Information" includes the Unitex epoxy product formulas and know-how and the ingredient suppliers. Superior considers its product formulations, including those of Unitex, to be confidential. (Tr. 145, 375.) In addition, Superior considers its raw material suppliers, including Western Material, to be confidential. (Tr. 140.) Finally, the Business Appraisal completed prior to the sale of Unitex to Superior indicates that Unitex's proprietary formulas and processes were valued at a significant amount. (PX 60, Tr. 377.)

The formulas considered by Superior to be confidential include the ingredients, combinations and proportions of the ingredients and the stoichiometry. (Tr. 469-72, 478, 483-84.) A competitor would gain an advantage by knowing these formulas. (Tr. 473.) Reverse engineering these formulas would be difficult and would require extensive analytical work, time and the right equipment. (Tr. 474, 479-81.) Superior's current Senior Technical Manager (chemist), Graham Howarth ("Howarth"), testified that he developed a "certain know how" regarding the development of epoxy formulas by working at Superior. (Tr. 475-76, 480, 486-88.)

### Confidentiality

Unitex keeps its product formulas on a password protected, off-line computer with access restricted to two employees. (Tr. 381.) Unitex employees are not permitted to disclose Unitex formulas, and it is company policy for employees to sign confidentiality agreements. (Tr. 146-47.)

According to Superior Technical Account Manager Scott Bain ("Bain"), visitors to Unitex were not permitted to go beyond the front office. (Tr. 146.) Also, according to Bain, Unitex's formulas were not posted in public view. (Id.) This was confirmed by Superior Product Manager David DeBruler ("DeBruler"). (Tr. 381-82.) Bain has never seen outsiders viewing, copying or stealing product formulas, but there were occasions where Superior's customers were in both the production and lab areas. (Tr. 251-52, 228.)

Yan testified that outside parties such as truck drivers and customers were frequently in the plant, including the lab. (Tr. 558.) Yan was not sure whether outsiders ever actually saw Unitex's product formulas and has never seen outsiders copy Unitex's product formulas. (Tr. 583.)

### Superior's Customer Information

#### The Information

Superior asserts that its "Confidential Customer Information" includes: (1) customer contact information, (2) pricing information, (3) types of products purchased, (4) knowledge of the inner workings of customers, (5) sales reports, (6) sales volumes, (7) purchasing requirements, (8) supplier information, and (9) product knowledge.

Information, such as purchasing requirements, pricing and sales volume, about a specific Superior customer would be helpful to Superior's competitors because it is valuable information that would otherwise have to be gathered at a cost. (Tr. 260, 264-65.) In addition, it takes years to develop a customer and gain a volume of information about that customer, including the pricing, volume of sales, type of products being sold and the specific contacts within the customer's organization. (Tr. 263.) Finally, the Business Appraisal completed prior to the sale of

-5-

Unitex to Superior indicates that Unitex's customer relationships were valued at a significant amount. (PX 60, Tr. 149.)

### Confidentiality

Superior keeps its customer information on a password-protected computer network. (Tr. 265.) Also, Superior requires its employees to sign confidentiality agreements. (Id.) In addition, Superior's visitors are not permitted to be in offices unattended and when sales persons leave Superior, they are not permitted to take customer lists with them. (Id.)

While Superior publishes suggested retail prices on the Internet, the vast majority of Superior's customers do not pay these suggested retail prices. (Tr. 236, 264.) None of Klover's customers while he was at Superior were charged the prices published on the Internet. (Tr. 131-32.)

Bain testified that it was important to him to keep sales reports, sales dollar figure information, customer lists, customer contact information, the products that customers buy, purchasing information and supplier information secret. (Tr. 152.) Andy Gaines ("Gaines"), Superior's General Sales Manager for its chemical line, testified that he considered customer information about Mortenson Construction Company ("Mortenson") confidential and that, as a key account manager, Klover's position at Superior, came in contact with confidential information including pricing, volume of sales, type of products that are being sold and who the specific contacts are within the organization . (Tr. 255, 260-63.)

### EPCO

In December of 2011, Linda Ungashick ("Linda") filed the documents to form EPCO. (Tr. 529.) Linda and Luke Ungashick decided to form EPCO because they saw an opportunity to

manufacture epoxy products that they could use in another of their businesses - Automated Ingredient Systems, LLC ("AIS") and an opportunity to sell epoxy products to other customers. (Id. 505-06.) However, Luke Ungashick ("Luke") did not have a basic knowledge of epoxy products. (Tr. 67.)

Initially, as the orgainzer, Linda was the sole member of EPCO. (Tr. 529.) Linda is currently AIS's CFO and the manager of EPCO. (Tr. 528-29.) Klover and Luke are the current members of EPCO. (Tr. 529.) The Ungashicks and Klover have been family friends for many years. (Tr. 58-59.)

Laszlo Goodell, who was fired by AIS, testified that "at the beginning of the year, January 2012" Klover came to AIS. (Deposition of Laszlo D. Goodell ("Goodell Dep.") ¶ 7, 23 Nov. 27, 2012.) At that time, Luke made the AIS employees aware that Klover was going to be a partner. (Id.)

While Klover was employed as a salesman by Superior, he discussed AIS's need for epoxy products with Luke. (Tr. 62.) As a result of that conversation, Klover established a customer account for EPCO with Superior. (Id.) Susan Wintz, Superior's Office Manager for the Unitex facility, set EPCO up as a private label account. (Tr. 198, 201-02.) For a period of time, EPCO purchased unlabeled epoxy products from Superior. (Tr. 203-04.)

At the time, Superior had no policy or procedure for the establishment of private label accounts. (Tr. 198.) Superior now says that its EPCO account was not established following the correct protocol because a part number for the account was not obtained from Bain. (Tr. 167-68.)

While at Superior, Klover contacted Luke and advised him that Mortenson needed a

product, a dobie brick, that was not offered by Superior.[3] (Tr. 520.) Luke contacted Mortenson, determined the specifications for what Mortenson needed, located the product in Kansas City and sold the product to Mortenson. (Id.) Mortenson first ordered the dobie bricks from EPCO on January 5, 2012. (PX 64.)

In order to do business with Mortenson, EPCO was required to complete a Supplier Setup/Tax Identification form and accept Mortenson's Standard Terms and Conditions. (Tr. 534-35; EK 20.) EPCO also had to agree to Mortenson's incentive program whereby Mortenson received back a portion of the amount they spent. (Tr. 535, EK 20.) Mortenson's incentive program with EPCO was not the product of any negotiations, Mortenson required EPCO to agree in order to do business with Mortenson. (Tr. 536.) EPCO has a similar non-negotiated incentive program with Fastenal, another EPCO customer. (Id.)

EPCO currently manufactures and sells epoxy products. (Tr. 74.) Those epoxy products are EPCO 15K, EPCO 19K and EPCO 30. (Tr. 74-75.) Luke independently developed the manufacturing processes that EPCO uses to manufacture its epoxy products. (Tr. 512.)

Klover was not involved in the decision to form EPCO and was not involved in any way in running EPCO before he resigned his employment with Superior. (Tr. 506, 507, 530.) Yan has never been a member of EPCO. (Tr. 529.)

### Klover's Employment History

Klover has approximately thirty (30) years of experience in selling epoxy products. (Tr. 585.) Before going to work for Unitex, Klover worked for Fastenal Company ("Fastenal"), an

---

[3]Gaines testified that Superior has continuously sold dobie bricks since at least the year 2000. (Tr. 257.) Klover testified that Mortenson wanted a particular dobie brick that Superior did not want to stock or to price and Superior was discontinuing it. (Tr. 114.)

industrial supply house, for 23 years. (Tr. 586.) While at Fastenal, Klover became aware of the various products that Fastenal purchased and sold and gained general knowledge of competitor pricing, competitor market share and customer purchase volumes. (Tr. 586-87.) He also gained a general knowledge of product suppliers and raw material suppliers. (Tr. 586.) While at Fastenal, Klover sold products to Mortenson and developed an understanding of Mortenson's personnel and needs. (Tr. 588.)

### At Unitex

In 2006, Klover went to work for Unitex as their Director of National Accounts. (Tr. 49.) At Unitex, Klover demonstrated a limited understanding of Unitex's chemical products and asked technical questions about the use and limitations of Unitex's products. (Tr. 156.) Unitex provided teaching opportunities for its sales personnel to learn about chemical products. (Tr. 156-57.)

Klover sold Unitex products only to Fastenal in 2006 and 2007. (Tr. 163-64.) In 2008, Klover sold Unitex products to four customers, including Unitex's first sales to Mortenson. (Tr. 164; PX 77.) Between 2008 and 2009, the Mortenson account grew under Klover. (Tr. 164-65.) As with all of his customers, Klover was aware of the pricing offered to Mortenson and Mortenson's product needs, information that Superior considered confidential. (Tr. 53-54, 260.)

### At Superior

As a result of Superior's purchase of Unitex in September of 2010, Klover ceased working for Unitex and was given the opportunity to apply for employment with Superior as a "newly hired" employee. (PX 38.) On September 13, 2010, Superior hired Klover as a Key Account Manager. (Tr. 50, 53; PX 59.)

Klover signed a Confidential Information & Inventions Agreement and a Conflict of Interest Agreement with Superior on September 13, 2010. (PX 43; PX 44; Tr. 52.) Klover did not have a non-compete agreement with Superior. (Tr. 292-93.)

Klover's Conflict of Interest Agreement prohibits employees from placing themselves in a dual interest situation or in a conflict between self-interest and the interests of Superior. (PX 44.) It also prohibits an employee from benefitting personally from any purchase of goods or services by Superior or deriving any personnel gains from actions taken as a representative of Superior. (Id.) Finally, the Conflict of Interest Agreement requires that employees avoid any investments, associations or other relationships that would or could conflict with the employee's responsibility to make objective decisions in Superior's best interest. (Id.)

Superior's cost of supporting a sales person, such as Klover, is "quite expensive." (Tr. 260.) Superior compensates its salesmen to develop customer relationships for the benefit of Superior. (Tr. 266.) This compensation includes reimbursement for such things as travel, meals, entertainment, phone, dues, fuel, supplies and training. (Tr. 159-60.) In particular, for the period from February of 2011 to February of 2012, Superior reimbursed Klover $44,011.10 for his expenses. (Tr. 160.)

On February 6, 2012, Klover resigned from Superior. (Tr. 63.) When he resigned from Superior, Klover testified that he had no existing plans to work for EPCO. (Tr. 66.)

**At EPCO**

When he resigned, Klover took no pricing lists or documents that showed Superior strategies. (Tr. 593.) He, however, copied himself on emails that listed customer information that he needed for the World of Concrete trade show and customer accounts and sales figures that

-10-

were relevant to commissions that were owed to him. (Tr. 591-92, 595-99.) Klover says that he used none of this information while at EPCO and that none of it provides any competitive advantage to him. (Tr. 599-600.)

On February 14, 2012, Klover emailed Mortenson from an EPCO email account using a signature block that indicates he was an EPCO employee. (Tr. 121-22; PX 69.) Mortenson confirms that product testing is complete. (Id.) In March of 2012, Klover received emails in his EPCO email account from Mortenson and a raw material supplier that was used by Superior.

After leaving Superior, Klover assisted EPCO in dealing with his previous Superior customers to ensure that these customers were properly serviced. (Tr. 594-95.) In April of 2012, Klover obtained a 51 percent ownership interest in EPCO and became an EPCO employee. (Tr. 67, PX 46.) On July 20, 2012, Klover signed an employment agreement with EPCO. (Tr. 72; PX 47.)

### Yan's Employment History

Yan has a Bachelor's Degree in Chemistry and a Master's Degree in Polymer and Composite Material Engineering. (Tr. 299.) From 1993 to 1997, Yan worked with epoxy grout, epoxy chock, epoxy binder and other epoxy products at a company called Carter-Waters. (Tr. 299-300.) At Carter-Waters, Yan's work included creating formulas for various epoxy product lines. (Tr. 549.) From early 1998 until September of 2003, Yan worked for a series of companies that ultimately were acquired by BASF. (Tr. 551.)

While working at BASF, Yan and another chemist created an Excel spreadsheet program that contained a data base of basic raw material information and simplified the process of calculating epoxy product formulas. (Tr. 551-52.) Prior to working for Unitex, Yan created more

-11-

than 50 product formulas using the Excel spreadsheet he and the other chemist created. (Tr. 553-54.) By the time he left BASF, Yan could easily design a new epoxy product to meet a customer's requirements. (Tr. 554.)

## At Unitex

In 2003, Yan went to work for Unitex as a its only chemist. (Tr. 301-02.) He was hired by Unitex to improve its product line. (Tr. 555.) Yan's duties included creating and improving product formulations and authorizing the purchase of raw materials. (Tr. 303.) Yan testified that, while at Unitex, he never attended "outside" training and did not learn anything from others about chemistry or epoxy formulations. (Tr. 556.)

Yan signed an Employment Agreement and a Noncompetition and Nondisclosure Agreement with ZEA d/b/a Unitex. (Tr. 301, 305; PX 1; PX 2.) Pursuant to the Employment Agreement, Yan agreed to be employed by ZEA for one year with successive one-year periods unless 60 days notice to the contrary is given by ZEA. (PX 1.) In the Employment Agreement, Yan agrees to "faithfully" perform his duties. (Id.) The Employment Agreement inures to ZEA's and Yan's respective heirs, personal and legal representatives, successors and assigns. (Id.)

The Noncompetition and Nondisclosure Agreement signed on August 8, 2003, provides that Yan will not compete with ZEA for a period of one year after his employment with ZEA. (PX 2.) Not competing is further defined in the Noncompetition and Nondisclosure Agreement as not engaging in any activity which is in competition with any product sold by or any business or activity engaged in by ZEA, as not having contact with any current ZEA customer and as not contacting any customer using leads developed while at ZEA. (Id.) This agreement also forbids Yan from disclosing any of ZEA's Confidential Information. (Id.) Finally, this agreement

-12-

provides that it cannot be waived, changed, modified, abandoned or terminated except by an instrument signed by a ZEA officer and Yan. (Id.)

Pursuant to the sale of ZEA's assets to Superior, Superior contends that certain of ZEA's rights in specified contracts were considered assets and sold to Superior. (PX 38.) Among those specified contracts were Yan's 2003 Noncompetition and Nondisclosure Agreement and Yan's Employment Agreement. (PX 38.)

After working with the Unitex formulations for more than eight years (Tr. 320-21), Yan is familiar with certain aspects of the product formulas. He knows the formulations (Tr. 302), that each manufacturer uses slightly different materials (Tr. 321), that the Unitex aggregate is different from that of competitors (Tr. 316-19) and that the Unitex binder contains unique combinations (Tr. 319-20).

### At Superior

As a result of Superior's purchase of Unitex in September of 2010, Yan ceased working for Unitex and was given the opportunity to apply for employment with Superior as a "newly hired" employee. (PX 38.) Yan applied and became a Superior employee in September of 2010. (Tr. 309.) With the exception of a change in the bonus program, Yan received essentially the same salary from Superior as he had been receiving from Unitex and he was allowed to keep his company car. (Tr. 309-10.) Superior also provided Yan with a 401k and health insurance. (Tr. 309.)

On September 13, 2010, Yan signed a Confidential Information & Inventions Agreement, a Conflict of Interest Agreement and a Policy Acknowledgment with Superior. (PX 3; PX 4; PX 5.) In November of 2010, Yan was offered and refused to sign a noncompete agreement with

-13-

Superior because he was not sure how long he would be working for Superior. (Tr. 561.)

The Confidential Information & Inventions Agreement provides that any of Yan's ideas , discoveries or inventions relating to Superior's business belong to Superior. (PX 3.) However, this provision does not apply to any inventions for which no Superior equipment, supplies, facility or trade secret information was used and which was developed entirely on Yan's own time unless the invention relates to Superior's business or demonstrably anticipated research of development or unless the invention results from any work performed by Yan for Superior. (Id.)

In February of 2012, Yan resigned from Superior with plans to start a business in China. (Tr. 330-31, 562.) Yan did not submit a resignation letter and wanted to help Superior during the transition period. (Tr. 385.) DeBruler reminded Yan that his 2003 Noncompete Agreement was still in effect during this time period. (Tr. 410.) After Yan resigned, he did not consider himself to be an employee of Superior any longer. (Tr. 562.)

Yan was paid as a full-time Superior employee until March 26, 2012. (PX 37.) In March of 2012, Yan traveled to China to start his own business. (Tr. 329.) The China business sells epoxy products to customers located in China and does not sell to customers located in the United States. (Tr. 329-30.)

After he returned from China, Yan met with Superior's CEO who asked Yan to withdraw his resignation. (Tr. 331.) When Yan refused, Superior's CEO asked Yan to represent Superior in China. (Tr. 331-32.) Yan again refused but assured Superior that he did not intend to directly compete with Superior in China. (Id.)  Yan agreed to help Superior make a smooth transition. (Tr. 334-35.)

At the March 2012 meeting, the parties agreed that Yan had resigned and could leave for

-14-

China any time. (Tr. 334.) Also, Superior's CEO asked everyone present to keep quiet regarding Yan's resignation. (Tr. 335.) Yan agreed, recognizing that Superior's customers would worry if they knew that Superior did not have an epoxy chemist. (Id.)

On March 12, 2012, Superior provided a letter to Yan offering to change his employment status to part-time and indicating that Yan's 2003 Noncompete Agreement would remain in effect. (YAN 13.) Yan did not sign the agreement, but Yan agreed to continue to do Superior work and Superior reduced Yan's pay effective March 26, 2012. (Tr. 335-36; YAN 13.) Superior continued to pay Yan at half his previous salary and continued to provide benefits until Yan signed a Consulting Service Agreement in July of 2012. (Tr. 336.)

Yan asked Superior many times to send him a written agreement that did not include a noncompete provision. (Tr. 564.) They never did. (Id.)

On July 2, 2012, Yan signed a Consulting Services Agreement with Superior. (Tr. 566; YAN 19.) The Consulting Services Agreement refers to Yan as Julian Yan of Heguang International, a consultant, and describes him as providing consulting services relating to Superior's product lines. (YAN 19.)

The Consulting Services Agreement includes a Confidentiality clause whereby Yan agrees to keep certain Superior information confidential. (Id.) Confidential information is defined in this agreement as "all trade secrets, proprietary information and other data or information (and any tangible evidence, record or representation thereof) whether prepared, conceived or developed by an employee or agent of the Company (or by Consultant) or received by the Company from an outside source which is maintained in confidence by the Company or the outside source who provided the information in question." (Id.)

The Consulting Services Agreement also includes a Noncompete Agreement. (Id.) The Noncompete Agreement provides that the Consulting Services Agreement does not affect the noncompetition and nondisclosure agreement that Yan signed on August 8, 2003 while an active employee with ZEA Corporation, Inc., and which inured to the benefit of Superior upon its acquisition of ZEA and such noncompetition and nondisclosure agreement shall be in effect until May 1, 2013, after Yan signs this Consulting Services Agreement. (Id.)

Finally, the Consulting Services Agreement provides that it is the complete and entire agreement between Superior and Yan. (Id.) All previous communications, representations and agreements, except the noncompetition and nondisclosure agreement identified elsewhere in the Consulting Services Agreement, are superceded. (Id.)

Superior terminated Yan's Consulting Services Agreement in a letter dated September 26, 2012. (YAN 25.) The Consulting Services Agreement was terminated, according to DeBruler, because Superior had found a chemist to replace Yan and because some accusations had been made against Yan. (Tr. 392-93.)

**EPCO Product Formulations**

Klover introduced Yan to Luke sometime after Klover resigned from Superior. (Tr. 67.) Yan was in contact with Luke and Klover via email in March of 2012. (PX 9.) Also, beginning in February of 2012, Yan met with Luke and Klover at EPCO multiple times. (Tr. 321-25.) In addition, Yan and Klover communicated between February and November 2012 via email to discuss EPCO technical product questions, customer concerns, raw material sourcing, manufacturing issues, testing and hiring. (Tr. 328-29, 340-47, 350-52, 358-63, 366-67.)

In February or early March of 2012, after he resigned from Superior, Yan provided the

formulas to EPCO for EPCO 15K grout. (Tr. 576.) He provided the formula to EPCO for EPCO 19K sometime in March. (Tr. 578.)  In May of 2012, Yan provided the formula to EPCO for EPCO 30. (Tr. 579.) Yan testified that the formulas for EPCO 15K, 19K and 30 are not the same as nor were they derived from any formula belonging to ZEA or Superior. (Tr. 576-77, 578, 579-80.) Finally, Superior never possessed any of these specific product formulas. (Tr. 580.)

Yan provided the formulas to EPCO because Klover was his friend and it did not take Yan long to develop the formulas. (Tr. 325.) The first step Yan used to develop these formulas was to reflect on his general knowledge about chemistry. (Tr. 325-26.) The second step was to perform some calculations. (Tr. 326.) The third and final step was to write down the formulas. (Tr. 326.)

Yan developed these formulas at home using the spreadsheet he had developed at Carter-Waters. (Tr. 573.) He estimates that it took him probably less than two hours to develop these formulas. (Tr. 573.) Finally, Yan testified that he could have developed these formulas if he had never worked for Superior or Unitex. (Tr. 581.)

Howarth testified that he did not know about the formulas that Yan created for EPCO, and that most of the raw materials used in Superior's grout are well known in the industry. (Tr. 489-90.) Bain and DeBruler also testified that they did not know what Yan did to create the formulas for EPCO. (Tr. 233-34; 421-22.)

At some point in time after the Consulting Services Agreement was terminated, Yan returned a laptop computer that he had been using to Superior. (Tr. 396.) Superior's IT Department found the laptop to be full of viruses and was unable to recover any information from it. (Id.)

-17-

Also, after the Consulting Services Agreement was terminated, Yan spent quite a few days at EPCO and answered Luke's and Klover's questions while he was there. (Tr. 364.) After Yan no longer had access to a vehicle provided by Superior, he used a vehicle that EPCO owned for a few weeks. (Tr. 365.) However, Yan is not currently employed by EPCO, he has never been employed by EPCO, he has never had any or been promised any ownership interest in EPCO and has never received any payments from EPCO. (Tr. 569-70.)

Finally, in November of 2012, the Yans, the Ungashicks and the Klovers entered into a deal to purchase a large, commercial building. (Tr. 370.) However, the vacant building has never been used by EPCO. (Id.)

### Superior's Actions Regarding EPCO, Klover and Yan

In February of 2012, Superior developed concerns about EPCO and Klover. (Tr. 271.) On April 21, 2012, Bain thought that Superior may need to take some actions regarding Klover, EPCO and possibly Susan Wintz. (Tr. 231.) In June and July of 2012, Bain wrote detailed emails summarizing his suspicions, including suspicions about Yan. (Tr. 231-32, 234; EK 32; YAN 21.) Gaines testified that, in late June of 2012, he was becoming more and more concerned that Klover was competing against Superior. (Tr. 292.)

Dated August 2, 2012, Superior wrote a "cease and desist" letter to Klover claiming that his and his company's actions were illegal and threatening legal action. (PX 80.) On August 8, 2012, the law firm representing EPCO responded denying any wrongdoing. (PX 81.) On August 14, 2012, Superior's law firm responded by disagreeing with EPCO's law firm and again threatened legal action. (PX 82.)

After September of 2012, Superior received eye witness information from Roy Parvin

-18-

and Laszlo Goodell that Yan was working at EPCO. (Tr. 253, 393.) The lawsuit in this matter, including the Motion for a Preliminary Injunction, was filed on November 7, 2012. (Doc. #3.)

## RELEVANT LEGAL PROVISIONS

A preliminary injunction is an extraordinary remedy who's purpose is to preserve the court's ability to render a meaningful decision after a trial on the merits. *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978). To obtain a preliminary injunction, a movant must first show that there is no adequate remedy at law for the alleged injury. *Dana Corp. v. Celotex Asbestos Settlement Trust*, 251 F.3d 1107, 1118 (6th Cir. 2001). If this is shown, the court must then weigh four factors: (1) whether the movant is likely to prevail on the merits; (2) whether the movant would suffer irreparable injury if the court does not grant the preliminary injunction; (3) whether a preliminary injunction would cause substantial harm to others; and (4) whether a preliminary injunction would be in the public interest. *Samuel v. Herrick Memorial Hospital*, 201 F.3d 830, 833 (6th Cir. 2000)(citing *Glover v. Johnson,* 855 F.2d 277, 282 (6th Cir. 1988)).

No single factor is determinative. *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000). The factors must be balanced against one another. *Id.*

Generally, the extent that the movant must demonstrate a likelihood of success on the merits varies inversely with the degree of harm the party will suffer absent an injunction. *Montgomery v. Carr*, 848 F. Supp. 770, 775 (S.D. Ohio 1993). Issuance of a preliminary injunction may be appropriate where the movant fails to show a strong likelihood of success on the merits but at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the non-movant if an injunction is issued. *Id.*(citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)). Finally, monetary or economic

-19-

harm by themselves do not constitute irreparable injury and failure to demonstrate irreparable injury may be fatal to a motion for a preliminary injunction. *Id.*(citing *Southern Milk Sales, Inc. v. Martin*, 924 F.2d 98, 103 (6th Cir. 1991); *State of Ohio ex rel. Celebreeze v. Nuclear Regulatory Commission*, 812 F.2d 288, 290 (6th Cir. 1987)).

## ANALYSIS

### Adequate Remedy At Law

Before granting injunctive relief, the Court must determine if Superior has an adequate remedy at law for its trade secrets claim and its covenant-not-to-compete claim. The trade secrets claim will first be considered.

Because trade secrets rights include the right to exclude, the damages arising from the misappropriation of trade secrets is irreparable and impossible to calculate. *Deutsch Inv. Mgmt., Ams., Inc. v. Riverpoint Capital Mgmt.*, No. 1:02-CV-577, 2002 U.S. Dist. LEXIS 16147 at *18 (S.D. Ohio Aug. 22, 2002.); *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011 (1984). "Therefore, where it is shown that the defendant has misappropriated the plaintiff's trade secrets, a preliminary injunction ordinarily should issue." *Id.*

In this case, Superior argues that Yan, Klover and EPCO have misappropriated Superior's trade secrets. Thus, there is no adequate remedy at law for Superior's trade secrets claim, assuming that it can be proved.

Regarding barring Yan from competing with Superior for one year, application of the "inevitable disclosure rule" could result in a finding that, where an employee who possesses an employer's trade secrets works for a competitor in a substantially similar capacity to the position he held while working for the employer, there is no adequate remedy at law and injunctive relief

-20-

is appropriate. *Prosonic Corp. v. Stafford*, 539 F. Supp.2d 999, 1007 (S.D. Ohio 2008)(citing *Jacono v. Invacare Corp*. No. 85505, 2006 WL 832541 at *7 (Ohio Ct. App. Mar. 30, 2006)). The "inevitable disclosure rule" is that "a threat of harm warranting injunctive relief can be shown by facts establishing that an employee with detailed and comprehensive knowledge of an employer's trade secrets and confidential information has begun employment with a competitor of the former employer in a position that is substantially similar to the position held during the former employment." *Patio Enclosures v. Herbst*, 39 F. App'x 964, 969 (6th Cir. 2002)(citing *Proctor & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 279 (Ohio Ct. App. 2000)).

Yan argues that the "inevitable disclosure rule" does not apply here because Superior's assertions that Yan would inevitably disclose its trade secrets are "pure speculation," because Yan never worked for a competitor of Superior's and is not currently working for one, because Superior has not offered any evidence that Yan has disclosed Superior's epoxy formulas to anyone and because when Superior hired Howarth, Superior was not concerned about hiring someone who would inevitably disclose the trade secrets of a prior employer.

Superior argues that Yan possesses Superior's trade secrets and is working for EPCO, a competitor, in substantially similar capacities to the position he held while working at Superior. Superior also argues that Yan had a noncompete agreement in place.

There is evidence that Yan worked for Superior as a chemist. While Yan may not have later worked for EPCO in the sense of being an employee and getting paid, there is clear evidence that he was working for EPCO in the sense of providing EPCO with epoxy formulas. The argument that there is no evidence that Yan disclosed Superior's epoxy formulas to EPCO and the argument that Superior was not concerned about hiring someone who would inevitably

-21-

disclose trade secrets is not determinative as to whether the "inevitable disclosure rule" applies because neither of these arguments is referenced in the "inevitable disclosure rule." And, the "inevitable disclosure rule" is, by its nature, speculation.

Thus, the "inevitable disclosure rule" may apply, and, if it does, there is no adequate remedy at law for Superior's covenant-not-to-compete claim against Yan, assuming that it can be proved. Finding that there may be no adequate remedy at law for Superior's claims that Yan, Klover and EPCO are using Superior's trade secrets and that Yan should be barred from competing with Superior for a period of one year, the Court next weighs the four factors to determine if injunctive relief should issue.

### Likelihood of Success On the Merits - Trade Secrets Claims

The Court first considers Superior's likelihood of success on the merits of its trade secrets claims. Under Ohio's Uniform Trade Secrets Act, actual or threatened misappropriation of a plaintiff's trade secrets may be enjoined. Ohio Rev. Code § 1333.62(A). To prevail on a misappropriation of trade secrets claim, a plaintiff must show (1) that a trade secret exists; (2) that the defendant acquired the trade secret as a result of a confidential relationship; and (3) that the defendant engaged in unauthorized use of the trade secret. *Heartland Home Fin., Inc. v. Allied Home Mtg. Cap. Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008).

### The Existence of a Trade Secret

A trade secret is information that derives independent economic value, actual or potential, from not being generally known to other persons and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Ohio Rev. Code § 1333.61(D). Therefore, to be a trade secret, the information must derive independent economic value from

-22-

not being generally known and the information must be subject to reasonable efforts to maintain its secrecy.

When determining whether information is a trade secret, a court must distinguish between "knowledge and skill that is general in the trade as a whole and 'secret' knowledge which is acquired particularly and specifically from the employer. *Valco Cincinnati, Inc. v. N & D Machining Service, Inc.*, 492 N.E.2d 814, 818 (Ohio 1986). Information that can be discovered by "fair and honest means, such as by independent invention, accidental disclosure, or by so-called reverse engineering, that is by starting with the known product and working backward to divine the process which aided in its development or manufacture," is not a trade secret. *Kewanee Oil Co. V. Bicron Corp.*, 416 U.S. 470, 476 (1974). For example, once a product is released, its design, components and technology are no longer secret because the product is subject to reverse engineering. *Jacono*, 2006 WL 832451 at *5.

Chemical formulations and pricing policies generally not known outside of a company have been found to be the company's trade secrets. *Penetone Corp. v. Palchem, Inc.*, 627 F. Supp. 997, 1006 (N.D. Ohio 1985). Also, listings of names, addresses, or telephone numbers that have not been published or disseminated or have not otherwise become a matter of general public knowledge have also been found to be trade secrets. *Fred Sigel Co., L.P.A. v. Arter and Hadden*, 707 N.E.2d 853, 862 (Ohio 1999).

Even information that is developed with or based upon generally-known information may be a trade secret. *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 410-11 (6th Cir. 2006). For example, design drawings that contain a mixture of secret information and non-secret information may be considered trade secrets. *Id.* In another example, a process developed by

trial-and-error over a several year period is considered a trade secret. *Levine v. Beckman*, 548

N.E.2d 267, 271 (Ohio Ct. App. 1988).

"The 'secrecy' requirement in trade secret law is not a demand of absolute secrecy." *CPG*

*Products Corp. v. Mego Corp.*, No. C-1-79-582, 1981 U.S. Dist. LEXIS 17657 at *29 (S.D. Ohio

Jan. 12, 1981). However, courts are generally concerned with whether the trade secret owner has

taken reasonable measures to protect the confidential information. *Id.*

Efforts to restrict physical access to trade secrets and requiring employees to execute

confidentiality agreements have been found to be reasonable steps to protect trade secrets. *Valco*,

492 N.E.2d at 819. The protection of computerized records through password-based access

restrictions has also been deemed reasonable protection. *The Rightthing, LLC v. Brown*, No. 3:09

CV 135, 2009 WL 249694 at *8 (N. D. Ohio Feb. 2, 2009).

Economic Value from Not Being Generally Known

Superior argues that certain of its Product Information and its Customer Information are

trade secrets. Superior considers Unitex's epoxy formulas to be confidential Product

Information. Superior also argues that, while there is no dispute that the formulas provided to

EPCO by Yan differ from the Unitex formulas, the formulas provided to EPCO by Yan are part

of its confidential Product Information since the formulas were developed by Yan while he was

still a Superior employee.

Superior argues that its confidential Customer Information includes: (1) customer contact

information, (2) pricing information, (3) types of products purchased, (4) knowledge of the inner

workings of customers, (5) sales reports, (6) sales volume, (7) purchasing requirements,

including requirements for engineering, testing and approval, (8) supplier information, including

-24-

raw material information, and (9) product knowledge.

So the first issue for the Court to decide is whether the Product Information and Customer Information identified by Superior as trade secrets derive economic value from not being generally known. The Court must also decide if the formulas developed by Yan and provided to EPCO derive economic value to Superior from not being generally known.

Superior's epoxy formulas use ingredients that are not generally known to Superior's competitors. Although the components of epoxy products are generally known as Part A, Part B and sometimes a Part C, the proportions of the Parts, including the stoichiometry, are not generally known and Superior's sources for the ingredients are not generally known. Further, Unitex has refined its formulas based upon customer feedback. Therefore, while the ingredients of epoxy products are generally known, the exact amounts of these ingredients currently used in Superior's epoxy formulas for specific products is not generally known. Superior's epoxy formulas could derive economic value if they are not generally known.

Regarding the Customer Information that Superior considers to be a trade secret, Superior develops and maintains contact information, pricing information, purchasing requirements, strategies and plans and sales information regarding its customers. Although some of this information, such as some of the names and general telephone numbers, may be publically available or easily obtained, the remainder of this information has economic value to Superior from not being generally known. For instance, the inner workings of a customer and the prices Superior charges a customer is information that is valuable to Superior if not generally

known by others.[4]

Another example is the inner workings of a customer such as who to call for specific information and how a customer's paperwork flows. This information is valuable to Superior because Superior has expended resources to obtain the information and presumably a competitor would have to do the same.

Finally, regarding the epoxy formulas Yan provided to EPCO, Superior admits that these formulas and Superior's formulas are not the same. However, Superior argues that it owns these formulas pursuant to the Confidential Information and Inventions Agreement signed by Yan. However, owning an epoxy formula, if it is in fact owned by Superior, is not evidence that the epoxy formula has independent economic value. And, Superior's witnesses admit that they are not familiar with the formulas that Yan provided to EPCO. Therefore, Superior has not shown that the formulas that Yan provided to EPCO have economic value to Superior from not being generally known.

In sum, the Product Information and the Customer Information that Superior has identified, aside from the epoxy formulas that Yan provided to EPCO, has an economic value to Superior from not being generally known. The next issue is whether Superior has taken reasonable efforts to maintain the secrecy of the Product Information and Customer Information that it has identified as trade secrets.

Reasonable Efforts To Maintain Secrecy

---

[4]While Superior publishes suggested retail prices on the Internet, the vast majority of Superior's customers do not pay these suggested retail prices. None of Klover's customers while he was at Superior were charged the prices published on the Internet.

-26-

There is evidence that Superior, operating as Unitex, as a matter of policy, requires its employees to sign confidentiality agreements. Regarding Superior's product formulas, there is evidence that Superior, operating as Unitex, as a matter of policy, does not allow visitors to be unattended beyond the front office. Also, as a matter of policy, Superior's epoxy formulas are not posted in public view. Finally, Superior, operating as Unitex, keeps its product formulas on a password-protected, off-line computer with access restricted to two individuals.

Yan testified that outside parties such as truck drivers and customers were frequently in the plant, including the lab, and that copies of the formula sheets were kept in the production area in open employee boxes/trays located in the hallway. However, there is no evidence that any of Unitex's formulas were ever copied by an outsider.

In sum, Superior's efforts to maintain the secrecy of the Product Information that it considers to be trade secrets are reasonable. While Superior production employees were permitted to view product formulas in the course of their employment, the employees were required by policy to sign confidentiality agreements.

Regarding the Customer Information that Superior considers to be a trade secret, as with the Product Information, employees are required to sign a confidentiality agreement and outsiders are restricted as to where they can go in the plant. Superior keeps this Customer Information on a password-protected computer network and, when sales persons leave Superior, they are not permitted to take customer lists with them. The Defendants identified no evidence to the contrary. Therefore, Superior's efforts to maintain the secrecy of the Customer Information that it considers to be a trade secret were reasonable given the nature and use of the information by employees.

-27-

Conclusion On the Existence of Trade Secrets

The Customer Information and Product Information identified by Superior as trade secrets are trade secrets. This information derives independent economic value from not being generally known to other persons and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

**Trade Secrets Acquired as a Result of a Confidential Relationship**

A confidential relationship may be inferred from the circumstances surrounding the relationship between the owner of the trade secret and the defendant. *See Vanguard Transportation Systems, Inc. v. Edwards Transfer & Storage Co., General Commodities Division*, 673 N.E.2d 182, 185-86 (Ohio Ct. App. 1996). Also, where an express agreement bars disclosure of trade secrets, the defendant acquires trade secrets through a confidential relationship. *MEMC Electronic Materials v. Balakrishnan*, No. 2:12-CV-344 , 2012 WL 3962905 at *7 (S.D. Ohio Sept. 11, 2012).

In this case, both Klover and Yan were employed by both Unitex and Superior. Also, both Klover and Yan signed a Confidential Information and Inventions Agreement and a Conflict of Interest Agreement with Superior which ban the disclosure of trade secrets.

Klover was employed by Unitex and later Superior in a sales position for approximately six (6) years. During this time, he was exposed to Superior's customer-related trade secrets.

Yan was employed by Unitex and later Superior as a chemist for approximately nine (9) years. During this time, he was exposed to Superior's product-related trade secrets.

Thus, a confidential relationship is inferred from the circumstances surrounding Klover's and Yan's employment with Unitex and later Superior. Also, Klover was privy to Superior's

-28-

customer-related trade secrets and Yan was privy to Superior's product-related trade secrets, issues not disputed by Klover or Yan. Therefore, Klover acquired Superior's customer-related trade secrets and Yan acquired Superior's product-related trade secrets as a result of confidential relationships.

### Unauthorized Use of the Trade Secret

Superior has shown, for purposes of its Motion for a Preliminary Injunction, that certain of its Customer Information and certain of its Product Information are trade secrets. Superior has also shown, for purposes of its Motion for a Preliminary Injunction, that Klover acquired its customer-related trade secrets as a result of a confidential relationship and that Yan acquired its product-related trade secrets as a result of a confidential relationship. The Court must now decide, for purposes of a preliminary injunction, whether Klover engaged in an unauthorized use of Superior's customer-related trade secrets and whether Yan engaged in an unauthorized use of Superior's product-related trade secrets.

Relevant Legal Provisions

Under Ohio law, the misappropriation of a trade secret means (1) the acquisition of a trade secret by one with knowledge that acquisition was improper or (2) the disclosure or use of a trade secret by one who used improper means to acquire knowledge of the trade secret or had knowledge of improper acquisition by another. Ohio Rev. Code § 1333.61(B). In trade-secret misappropriation cases, "the court must reconcile the conflicting rights of an employer to enjoy the use of secret processes and devices which were developed though his own initiative and investment and the right of employees to earn a livelihood by utilizing their personal skill, knowledge and experience." *GTI Corp. v. Calhoon*, 309 F. Supp. 762, 768 (S.D. Ohio 1969).

A trade secret is misappropriated if it is used with modifications or improvements so long as the substance of the process used is derived from the trade secret. *Mangren Research and Development Corp. v. National Chemical Company, Inc.*, 87 F.3d 937, 944 (7th Cir. 1996); *American Can Co. v. Mansukhani*, 742 F.2d 314, 328-29 (7th Cir. 1984). However, an employer cannot prevent a former employee from using the skill and intelligence gained through experience received in the course of the employment. *Calhoon*, 309 F. Supp. at 769.

Under the "inevitable disclosure rule," a former employee working for a competitor will be enjoined because an individual cannot compartmentalize a competitor's knowledge and disclosure or misappropriation of trade secrets is inevitable. *Balakrishnan*, 2012 WL 3962905 at *9 (citing *Dexxon Digital Storage, Inc. v. Haenszel*, 832 N.E.2d 62, 68-69 (Ohio Ct. App. 2005)). For example, an employee misappropriates trade secrets when the employee emails trade secrets from his or her private email shortly before resigning and almost immediately beginning to work for a competitor. *The Rightthing*, 2009 WL 249694 at *9.

However, there are cases where the "inevitable disclosure rule" may not apply. For example, the "inevitable disclosure rule" does not apply where there is not an enforceable noncompetition agreement. *Hydrofarm, Inc. v. Orendorff*, 905 N.E.2d 658, 663 (Ohio Ct. App. 2008). This is because an employee who has been exposed to his former employer's trade secrets has the right to use his knowledge, other than trade secrets, for the benefit of a new employer. *Id.* Yet, courts have enforced the "inevitable disclosure rule" in the absence of a noncompetition agreement where the former employee had timely, sensitive, strategic and/or technical information that, if it was proved, posed a serious threat to the former employer's business. *Id.* at 665.

Misappropriation by Klover?

Superior argues that Klover misappropriated its customer-related trade secrets when he emailed customer lists and price lists to his private account. Superior also argues that Klover misappropriated its customer-related trade secrets when he placed Mortenson in contact with EPCO.

Klover has approximately thirty years of experience in the construction industry, including twenty-three years of experience selling epoxy products before he went to work for Unitex. Klover worked for Fastenal for twenty-three years where he became knowledgeable about the products Fastenal purchased and sold. Also, he gained a general knowledge of competitor pricing, competitor market share and customer purchase volumes. Finally, while at Fastenal, Klover sold products to Mortenson and developed an understanding of Mortenson's personnel and customer needs.

Klover testified that he emailed customer and price lists to himself because he needed the information for the World of Concrete trade show and for the calculation of commissions owed to him by Superior. He also testified that the information contained in these emails does not give him a competitive advantage. The use of this information by Klover was not improper.

Finally, Klover testified that he introduced Mortenson to EPCO because Mortenson needed a product, dobie bricks, that Superior did not provide. Yet, Superior says it has always provided dobie bricks.

The Court assumes that there is more than one specification for dobie bricks and the evidence does not indicate which specific dobie brick Superior has always provided and which specific dobie brick Mortenson needed at the time. Irregardless, Klover believed that Superior

-31-

could not provide what Mortenson wanted so he found an alternative and Klover had knowledge about Mortenson before he came to Unitex.

In sum, Superior has not shown that Klover misappropriated any of its confidential Customer Information. Klover had a wealth of knowledge and experience before going to Unitex and he is entitled to use that knowledge and experience at EPCO.

However, the "inevitable disclosure rule" must be considered with regard to Klover. He was working for Superior and is now working for EPCO and it is undisputed that Superior and EPCO are competitors. However, Klover did not have a noncompetition agreement with Superior. Further, Klover does not now have Superior's timely, sensitive, strategic and/or technical information that, if it was proved, poses a serious threat to Superior's business. The secret customer information that Superior alleges Klover was exposed to is now public, outdated or obsolete. Superior's pricing information is certainly time-sensitive, and information regarding customers was known to Klover before he came to Unitex and, if not known, could easily be gained later. Therefore, the "inevitable disclosure rule" does not apply to Klover and Superior has not shown, for purposes of a preliminary injunction, that Klover misappropriated its trade secrets.

Misappropriation By Yan

Turning next to Yan, Superior argues that Yan misappropriated Superior's product-related trade secrets when he provided epoxy formulas to EPCO. Superior also argues that the epoxy formulas that Yan provided to EPCO were based upon Yan's knowledge of the Unitex formulas and products.

There is no evidence that the epoxy formulas that Yan proved to EPCO are Superior's

-32-

trade secrets. There is also no evidence that Superior spent any effort involving time or money specifically on the epoxy formulas that Yan provided to EPCO. In addition, Yan testified that the epoxy formulas that he provided to EPCO are not the same as and are not derived from any formula belonging to Unitex or Superior. However, Yan's actions could be considered misappropriation if the epoxy formulas that he provided to EPCO were based upon knowledge he gained while at Unitex and Superior.

Yan is a degreed chemist who had ten (10) years of experience in the epoxy industry before coming to Unitex. This experience included regularly creating epoxy formulas.

While at a prior employer, Yan created a spreadsheet to assist him in creating epoxy formulas. To create the epoxy formulas that he provided to EPCO, Yan relied on his general knowledge about epoxy products and used the spreadsheet that he had developed. He testified that he did not look at or use any Superior documents or information to create these formulas. He created them in less than two (2) hours at home at night. Finally, Yan testified that, had he never worked for Unitex or Superior, he would have been able to provide the epoxy formulas to EPCO.

The evidence indicates that Yan created the epoxy formulas that he provided to EPCO using only his general knowledge of chemistry and experience in the epoxy industry prior to working for Unitex. Yan cannot be considered to have misappropriated the product-related information that Superior considers to be trade secrets by using knowledge and experience that he gained through the course of his employment before Unitex and Superior.

Superior argues that general knowledge was necessary but not alone sufficient to develop the epoxy formulas that Yan provided to EPCO. As support, Superior identifies several arguments, some of which are based on inaccuracies and some of which are merely

-33-

circumstantial. From the evidence presented, the Court declines to infer that Yan's general knowledge alone was not sufficient to develop the epoxy formulas that Yan provided to EPCO.

Thus, Superior has not shown, for purposes of a preliminary injunction, that Yan directly misappropriated its secret product-related information. However, the "inevitable disclosure rule" must be considered.

Yan worked for Superior and then worked for EPCO in the sense of providing epoxy formulas to EPCO. Also, it is undisputed that Superior and EPCO are competitors. Thus, the "inevitable disclosure rule" applies if Yan had a noncompete agreement with Superior at the time he provided the epoxy formulas to EPCO or if Yan possessed timely, sensitive or strategic and/or technical information regarding Superior's product-related secrets.

Yan argues that he did not have a noncompete agreement with Superior at the time he provided the epoxy formulas to EPCO and Superior argues that he did. Yan signed a noncompete agreement with ZEA/Unitex in 2003 that provided that Yan would not compete with ZEA for a period of one year after his employment with ZEA ended. Yan's employment with ZEA ended in September of 2010 when Superior acquired ZEA d/b/a Unitex. Finally, there is no evidence that Yan had a noncompete agreement with Superior when he provided the epoxy formulas to EPCO.

Superior argues that the noncompete agreement that Yan signed while at ZEA d/b/a Unitex was assigned to Superior and remains in effect. Yan does not argue that this noncompete agreement was not assignable, but that it provides certain obligations to ZEA and should be interpreted literally and not be interpreted to give Superior greater rights than ZEA had.

The evidence of record indicates that the noncompete agreement that Yan signed while at ZEA was assigned to Superior. However, there is also evidence that the noncompete provided

-34-

that Yan would not compete with ZEA for one year after his employment with ZEA ended, and there is no evidence that Yan agreed to the assignment or agreed not to compete with Superior. In fact, until he signed the 2012 Consulting Services Agreement, Yan specifically declined to sign a noncompete agreement that Superior had provided. Also, the noncompete could have been drafted to say that it began to run when Yan's employment with his Employer on any successor employer terminated but it was not. Thus, the noncompete agreement with ZEA d/b/a Unitex that Yan signed ended in September of 2011, one year after Yan's employment with ZEA ended. *See W. R. Grace & Co. v. Hargadine*, 392 F.2d 9 (6th Cir. 1968)(a covenant not to compete is not assignable without the consent of the employee).

In sum, Yan did not have a noncompete with Superior in early 2012 when he provided the epoxy formulas to EPCO. Also, Yan, by virtue of his employment as a chemist with Unitex and later Superior, had technical information that could pose a threat to Superior's business. But, as more fully explained above, Superior has not proved that Yan used this technical information to pose a serious threat to Superior's business. Thus, the "inevitable disclosure rule" does not apply to Yan regarding his provision of the epoxy formulas to EPCO in early 2012, and Superior has not shown, for purposes of a preliminary injunction, that Yan misappropriated its product-related trade secrets.

Misappropriation By EPCO

EPCO is accused of misappropriating Superior's trade secrets by virtue of obtaining them through Klover and Yan. However, as determined above, Superior has not shown for purposes of a preliminary injunction, that Klover or Yan misappropriated its trade secrets. Therefore, EPCO cannot be found to have misappropriated Superior's trade secrets.

-35-

### Conclusion Regarding Trade Secrets Claims

Superior has not shown, for purposes of obtaining a preliminary injunction, that it has a likelihood of success on the merits on its trade secrets claims against Klover, Yan and EPCO. The Court must next consider Superiors likelihood of success on the merits on its noncompete claim against Yan.

### Likelihood of Success On the Merits On Noncompete Claim

The Court next considers Superior's likelihood of success on the merits of its noncompete claim. Superior argues that Yan now worked for EPCO in violation of the 2003 Noncompete Agreement that Yan signed with ZEA d/b/a Unitex. Yan responds that this noncompete agreement is without force.

A preliminary injunction may be issued to enforce a covenant not-to-compete where the agreement to be enforced is valid, the agreement's restrictions are reasonable and the party seeking injunctive relief has demonstrated irreparable harm. *Prosonic*, 539 F. Supp.2d at 1002-03 (citing *Chicago Title Insurance Corp. v. Magnuson*, 487 F.3d 985, 991 (6th Cir. 2007)). However, as more fully explained above, the noncompete agreement that Yan signed with ZEA d/b/a Unitex has expired and is, thus, no longer valid.

Yan has entered into a Consulting Services Agreement with Superior in July of 2012 that includes a noncompete clause. However, Superior does not seek to enforce this noncompete clause so the Court will not consider its validity here.

Also, the Parties argue much about whether Yan was a Superior employee when he provided the epoxy formulas to EPCO. Although Superior has not convinced the Court that Yan was an employee at that time, the Court fails to see the relevance of this argument.

-36-

Since Superior had no enforceable noncompete agreement in place when Yan provided the epoxy formulas to EPCO, Superior has not shown for purposes of a preliminary injunction, that it will succeed on the merits of its noncompete claim against Yan.

### Irreparable Injury

A showing of irreparable injury is generally required to warrant injunctive relief. *Kendall Holdings, Ltd. v. Eden Cryogenics LLC*, 630 F. Supp.2d 853, 866 (S.D. Ohio 2008)(citing *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)). Irreparable injury is harm that a court would be unable to remedy if the movant prevails in the final adjudication such as harm that could not be compensated by calculable money damages. *Id.* at 866-67 (quoting 13 James Wm. Moore et al., *Moore's Federal Practice* § 65.06 at 65-22 (3d ed. 2008)). Finally, irreparable injury is usually not presumed, but instead, must be proved. *Hydrofarm*, 905 N.E.2d at 664.

Irreparable injury generally results from a competitor's misappropriation of trade secrets due to "the potential for lasting and unjust competitive harm that would not otherwise occur." *Novak v. Farneman*, No. 2:10-CV-768, 2010 WL 4643002 at *6 (S.D. Ohio Nov. 9, 2010). In addition, an actual threat of irreparable injury may be established by showing that the employee possessed the employer's trade secrets. However, a delay between the discovery of the alleged violative conduct and the request for injunctive relief can support an inference that the alleged harm is not irreparable. *Kendall*, 630 F. Supp.2d at 867.

Irreparable injury also generally results from a competitor's misappropriation of confidential customer information. *See Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010)(a loss that is difficult to replace or difficult to measure is irreparable); *Stuhlbarg Intern. Sales Co. v.*

*John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001)(evidence of threatened loss of prospective customers or goodwill is irreparable harm); *Muniauction, Inc. v. Thompson Corp.*, 502 F. Supp.2d 477, 482-83 (W.D. Pa. 2007)(loss of market share is irreparable injury), *rev'd on other grounds*, 532 F.3d 1318 (Fed. Cir. 2008).

Superior argues that it is suffering and will continue to suffer irreparable harm because it cannot easily quantify its losses, because it has demonstrated that Klover's, Yan's and EPCO's efforts have diminished its market share, because Superior has the right to exclude Klover, Yan and EPCO from the use of its trade secrets and because Yan violated his noncompete and Yan and Klover have violated their Conflict of Interest and Confidential Information & Inventions Agreements. Yan responds that Superior seeks an extremely delayed injunction and cannot possibly demonstrate irreparable injury. EPCO and Klover respond that Superior's delay in seeking an injunction undercuts Superior's irreparable injury argument and Superior's alleged damages are compensable.

First, the Court accepts Superior's argument that it cannot easily quantify its losses and that EPCO has diminished Superior's market share. But, these, alone, do not show irreparable injury.

Second, Superior has the right to exclude Klover, Yan and EPCO from the use of its trade secrets. But, for the purpose of this requested preliminary injunction, Superior has not shown that Klover, Yan or EPCO are illegally using or have illegally used its trade secrets.

Finally, the Court need not and does not address whether Superior unduly delayed seeking injunctive relief. Superior has not otherwise shown, for the purpose of the requested preliminary injunction, that it has suffered irreparable injury.

**Substantial Harm**

The Court must next consider whether a preliminary injunction would cause substantial harm to others. The only harm from the issuance of an injunction would be to Yan, Klover and EPCO.  Yet, Superior has not shown, for purposes of the requested preliminary injunction, that Klover, Yan or EPCO have done anything illegal. Therefore, Superior has not shown that a preliminary injunction would cause substantial harm to others.

**Public Interest**

Finally, the Court must consider whether the issuance of a preliminary injunction would be in the public interest. Generally, upholding reasonable contracts is in the public interest. *Prosonic*, 539 F. Supp. 2d at 1008. In addition, maintaining commercial ethics and protecting trade secrets in which a plaintiff has substantially invested are in the public interest. *Kendall Holdings, Ltd. v. Eden Cryogenics LLC*, 630 F. Supp.2d 853, 869 (S.D. Ohio 2008). Finally, the public interest is served in the enforcement of valid restrictive covenants contained in lawful contracts. *ALTA Analytics, Inc. v. Muuss*, 75 F. Supp.2d 773, 786 (S.D. Ohio 1999).

Based upon the evidence presented regarding the preliminary injunction, the public interest does not favor enjoining Yan, Klover and EPCO. Superior has not shown that they have done anything illegal.

**CONCLUSION**

Based upon the evidence presented regarding the requested preliminary injunction, there may be no adequate remedy at law. However, Superior has not shown that it is likely to succeed on the merits of its trade secrets claims against Klover, Yan and EPCO or that is likely to succeed on the merits of its noncompete claim against Yan. Superior has also not shown, for

purposes of the requested preliminary injunction, that it will suffer irreparable harm or that issuing an preliminary injunction would be in the public interest. Finally, there is no evidence, for purposes of the requested preliminary injunction, that there will be substantial harm to others if a preliminary injunction would issue.

The balance of the factors to be considered for the issuance of a preliminary injunction weighs in favor of not issuing a preliminary injunction. Superior's Motion for a Preliminary Injunction (doc. #3) is OVERRULED. Further, the previously issued Temporary Restraining Order is hereby dissolved.

## REQUEST FOR SHOW CAUSE ORDER

Superior has filed a Motion for an Order Directing Defendants, Michael Klover and Epoxy Products Company LLC To Show Cause. (Doc. 54.) Therein, Superior asks that the Court issue an order directing Klover and EPCO to appear and show cause as to why they should not be held in contempt for their refusal to comply with the previously issued Temporary Restraining Order. Superior also requests that the Court hold an evidentiary hearing on this Motion to coincide with the hearing on Superior's Motion for a Preliminary Injunction.

The requested hearing has been held and this Motion has been fully briefed. As a result, Superior has not shown that Klover or EPCO are in violation of the Temporary Restraining Order. Therefore, Superior's Motion for a show cause order (doc. #54) is without merit and is OVERRULED.

**DONE** and **ORDERED** in Dayton, Ohio this Eighteenth Day of April, 2013.

s/Thomas M. Rose
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

-40-

Copies furnished to:

      Counsel of Record